## SPEED OF RAILWAY TRAINS AT DANGEROUS CROSSINGS WITHIN MUNICIPAL LIMITS.

[Circuit Court of Lucas County.]

THE LAKE SHORE & MICHIGAN SOUTHERN RAILWAY COMPANY v. ROBERT JOHNSTON.

Decided, June 13, 1903.

*Negligence—At Railway Crossing—Speed of Train At, Within Municipal Limits—Ordinance Limiting Speed—Absence of Watchman or Gates —Tracks Hidden from View—One in Peril Without Fault—Wrong Choice Between Hazards.*

1. An allegation that a railroad company was guilty of negligence in not maintaining a gate or keeping a watchman at the crossing where the accident complained of occurred is proper, and should not be stricken from the petition.

2. A railroad company may be held by the verdict of a jury and by law to have been guilty of negligence as to the running of a train over a street crossing, if the crossing is within the limits of a city or village or suburb, where a view of the tracks is in a measure obstructed by houses, and there are no gates at the crossing, and no watchman to warn persons attempting to cross of an approaching train and the speed of the train was, as in the case under consideration, more than thirty miles an hour.

3. The fact that a train was running at a higher rate of speed than is permitted by a municipal ordinance is a circumstance which may be taken into consideration by a jury in determining the question of alleged negligence in the running of said train.

4. J., while driving along a street after dark, came to a point where six different railway tracks belonging to two different roads crossed the street at an angle, and were partially hidden by buildings, and there was no watchman. Different persons in the vicinity shouted at him, and some one cried "hurry up." Acting on the impulse of the moment and under a miscalculation as to which track the train. was on, he attempted to reach a safe place between the tracks, his horse went forward farther than he designed, and was struck, and horse, vehicle and driver came into collision with the train. *Held:* That J. was not guilty of contributory negligence.

PARKER, J.; HULL, J., concurs; HAYNES, J., dissents.

This proceeding is brought to obtain the reversal of a judgment of the court of common pleas of this county. The action in the

court below was by Johnston against the railway company, to re-
cover for personal injuries and loss of property in consequence of
an accident—a collision—happening to himself and horse and ve-
hicle by a train on the railway company's track, in passing through
this city, which accident he says was due to the negligence of
the railway company.    The accident happened upon the 31st of
July, 1901, at about 8:15 or 8:20 p. m., standard time, at a crossing
of the railroad over Central avenue, which is a street running east
and west in the westerly part of the city.    The Lake Shore & Michi-
gan Southern Railroad and the Michigan Central Railroad at that
place run parallel to one another, in a northeasterly and south-
westerly direction, the Lake Shore road at that point having one
main track lying westerly of the tracks of the Michigan Central.
The Michigan Central Road at that point has two parallel tracks—
main tracks—crossing over the street, the westerly of the Michigan
Central tracks lying about sixty feet easterly from the Lake Shore
track, and the easterly of the Michigan Central tracks lying per-
haps seven or eight feet easterly from its westerly track.    There is
also lying easterly of these tracks a distance of perhaps seven or
eight feet, another track of the Michigan Central Railroad extend-
ing from the north side of Central avenue and parallel with the
other tracks, a distance of perhaps a thousand feet—called a spur
track—which does not cross the street.

Johnston on the occasion of this accident was passing west-
ward upon the street, riding in an open vehicle—a light wagon,
one witness called it a Democrat wagon—driving one horse, being
alone in the wagon and with no load excepting a buggy tongue,
which was placed in the body of the wagon and projected out behind
for some distance.    He was a man of about sixty-three years of age.
His horse was a steady, tractable animal.    It was in the dusk of the
evening.    There was some controversy as to just how dark it was,
but it was dusk.

Before proceeding further with a statement of the facts, I should
mention that the trial in the court below resulted in a verdict in
favor of Mr. Johnston for $4,000, and a judgment upon this ver-
dict.    At the close of the plaintiff's testimony, a motion was made
to take the case from the jury.    This motion was overruled.    This

motion was renewed after the testimony was all in on both sides, and was again overruled, and upon each occasion the railroad company excepted.    A motion for a new trial upon various grounds was made, and it was also overruled.    There was also a motion on the part of the railroad company for a verdict on the answers to certain special interrogatories, notwithstanding the general verdict against the company, and this motion was overruled. Error is predicated upon this action of the court, and it is urged that the verdict was against the weight of the evidence.    I shall refer to and discuss that proposition later, and it may be unnecessary to consider a variety of other questions presented.

The railroad train which came into collision with Mr. Johnston and his rig was proceeding from the northeast to the southwest over the tracks of the Lake Shore road.    I do not state the points of the compass exactly; and perhaps it would be more accurate to say that these various lines of track ran in a direction east of north and west of south, but they cross the street at an angle somewhat acute—not at a right angle.

It is charged in the petition that the railroad company was negligent and its servants were negligent in that the train was running at a higher rate of speed than was consistent with the safety and rights of the public—those having a right to use the street at this point; also that the defendant was negligent in that there was no headlight upon the locomotive and that no bell was rung or whistle blown, or other signal or warning given to apprise Mr. Johnston of the approach of this train, and it is averred that the city of Toledo had before this time passed an ordinance requiring that railroad trains passing over streets in the city should not be run at a higher rate than six miles an hour, nor at a lower rate of speed than three miles an hour.    The testimony of witnesses shows that on this occasion this train was running at a rate of speed in excess of thirty miles per hour and perhaps as high as forty or forty-five miles per hour.    It was conceded upon the trial by the railroad company that it was running at a rate of thirty miles an hour.

As to the other negligence alleged—negligence other than the high rate of speed—it is only necessary to say that the answers to the special interrogatories take those questions out of the case, the

jury having found specifically that the headlight was burning, that the bell was rung, and that a crossing signal was given.  I should mention also that it was charged that the company was negligent in sounding the whistle, in a very loud and violent way, just as the locomotive reached the crossing, and it is admitted and established by the evidence that the whistle was sounded at that point, or about that point, as a signal for a station—the Wagon Works station—about half or three-quarters of a mile farther to the southwest.

The case has been one of considerable doubt and difficulty to this court and we have not been able to arrive at unanimity  The opinion which I shall announce will be that of a majority of the members of the court, Judge Haynes dissenting from our conclusions.

That the railroad company was negligent in maintaining this high rate of speed at this point, does not seem to us to be very seriously controverted; to state it fairly, I will say that it does not seem to us that it can be successfully controverted.  While it has been held by our Supreme Court in the case of *Railroad Co.* v. *Kistler*, 66 Ohio St., 326, that a railroad company may run its trains at any speed it may desire, no matter how high, in order to accomplish the purposes of a railroad, in the open country where there are no circumstances to make it necessary for it to run at a low rate of speed or to slow up; yet it is unquestionably the law, we think, that through cities and villages and the suburbs of cities where it is thickly settled—where there are houses and other obstructions to those passing along the highway, so that they can not readily observe approaching trains at places where railroad trains are required to pass over the highway crossings; where there are no gates, as was the case here; where there are no watchmen stationed to warn travelers upon the highway, as was the case here at this hour of the day—a railroad company may be deemed and held by the verdict of a jury and by the law to be guilty of negligence if it maintains as high a rate of speed as thirty miles an hour.  This subject is discussed in Vol. II of Shearman & Redfield on the Law of Negligence, Section 460, and the following sections, and we think the result of the discussion there and the authorities cited sustain what we have just announced.

In the 144 U. S., at page 408 (*Grand Trunk Ry. Co. v. Ives*), it is said in the syllabus that:

"The running of a railroad train within the limits of a city at a greater rate of speed than is permitted by the city ordinances, is a circumstance from which negligence may be inferred in case an injury is inflicted on a person by the train.

"Whether ordinary care or reasonable prudence requires a railroad company to keep a flagman stationed at a crossing that is especially dangerous, is a question of fact for a jury; although in some cases it has been held to be a question of law for the court."

In the course of the opinion by Justice Lamar, this is said:

"It is further urged that the court erred in giving to the jury the following instruction:

" 'If you find from the evidence in this case that the railroad train which killed Elijah Smith was moving at a rate of speed forbidden by the city ordinances, * * * the law authorizes you to infer negligence on the part of the railroad company as one of the facts established by the proof.'

"It is said that no evidence was introduced with respect to an ordinance of the city regulating the speed of railway trains. Counsel, in this matter, labor under a misapprehension. The bill of exceptions states that 'the ordinance of the city of Detroit prohibiting the running of railroad trains within the limits of the city, at a greater rate of speed than six miles per hour,' was admitted in evidence, over the defendant's objections. As there was a great deal of evidence introduced on behalf of the plaintiff that the train which killed Mr. Smith was running at a much more rapid rate than the ordinance permitted, the instruction quoted was applicable, and, under the authorities, was as favorable to the defendant as it had the right to demand. Indeed it has been held in many cases that the running of railroad trains within the limits of a city at a rate of speed greater than is allowed by an ordinance of such city is negligence *per se*."   (Citing Mississippi and Virginia cases.)

"But perhaps the better and more generally accepted rule is that such an act on the part of the railroad company is always to be considered by the jury as at least a circumstance from which negligence may be inferred in determining whether the company was or was not guilty of negligence."   (Citing cases from Nebraska, Illinois, Iowa, Georgia and Louisiana.)

And this latter proposition we understand to be the law of Ohio—that is to say, that the running of a train at a greater rate of speed

than· is provided· for ·by. ordinance is not proof of. negligence, but the fact that the train was running at a higher rate of speed than provided by law, may be taken into consideration by the jury on the question of negligence.

In a case in 7 Ohio Decisions, at page 450 (*C., C. & I. Ry. Co.* v. *Louis Reis*), decided by the Circuit Court of Hamilton County, the opinion was rendered by Judge Smith, and I read from that case because what is said is applicable to certain facts and proceedings in this case, to which I will make further reference:

"There is another matter to which we deem it proper to call attention, although it is not involved in the case as it now stands. It appears from the papers and transcript that the plaintiff, in his original petition, set out another ground of negligence on the part of the defendant, in connection with those already referred to, the substance of which was that the railroad company had caused this crossing to be a dangerous one by reason of the excavations made in the road and track, and the obstructions on the bank which prevented a view of approaching trains, and that the defendant had negligently and carelessly omitted to place and maintain gates or guards there, or have a flagman at the crossing to warn travelers of approaching trains. Those allegations as to negligence of the company in failing to have gates or a flagman there were on motion stricken out by the court against the exception of the plaintiff.

"We think this should not have been done; that the plaintiff was entitled to have these allegations remain in the petition, and to establish them if he could do so. While it is true that a railroad company is not as a rule, in the absence of a statute requiring it, bound to maintain gates or keep a watchman at a crossing, yet there are cases where the obligation is imposed upon them to adopt these, or another safe mode to protect travelers, and if it could be shown that this was such a crossing, and that there had been a failure on the part of the company to make such provision, that would be negligence, and they might be liable for injuries caused by such failure."

In the case at bar, the original petition contained an averment that the city had passed an ordinance requiring a flagman at this point, and perhaps a gate also, and that the action of the railroad. company was negligent and in violation of this ordinance in not furnishing a flagman at this time and place and in not providing gates. That, on motion of counsel for the railroad company, was

stricken from the original petition. We are inclined to think that perhaps that action on the part of the court was correct, because of the immateriality of the averment that the city had made that provision, but we think that the substance of the charge, i. e., that the railroad company had been negligent in not providing gates or watchmen at this point, should have been preserved in the petition, if it could have been preserved as the petition then stood by striking out a part of the averment; or, if not, that it ought to have been restored in some way to the petition. The case would have been in a more satisfactory shape for the court if this averment had been in the petition. Nevertheless, if there was negligence in either of these particulars, the absence of gates or watchman was concomitant with the negligence charged; and perhaps it is immaterial whether it is charged that the company was negligent in not maintaining a gate or in not providing a watchman, in view of the fact that the train was run at this high rate of speed; and the negligence charged is the running of the train at a high rate of speed over a crossing in a city where there was no watchman and no gate. It appears from the evidence that there was no watchman there and no gate.

In *The New York, Chicago & St. Louis Railroad Company* v. *Swartout,* 6 Ohio Circuit Court Decisions, p. 768, in the syllabus, it is said that—

"A railroad company may, because of the speed and management of its trains, make it necessary or incumbent upon itself to place a flagman or bars at the crossing of its tracks by a public highway."

And that is the gist of what is said upon the subject in the remarks of Judge Frazier in the course of his opinion.

In the case of *Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.* v. *M. E. Richardson,* 10 Ohio Circuit Court Decisions, p. 326, it is said, in the syllabus, that:

"The failure to maintain gates or flagman at crossings outside a municipality, is not, as a matter of law, negligence; but whether the circumstances of a particular case, or the situation at a particular crossing, required, in the exercise of ordinary care, gates or flagmen is a question for the jury."

· The opinion in that case was by Judge Hull, of this bench, sitting in the Circuit Court of Cuyahoga County.

In *Schweinfurth, Admr., v. The C., C., C. & St. L. Ry. Co.*, 60 Ohio State, 215, the fourth clause of the syllabus reads:

"In an action against a railroad company for wrongfully causing the death of a person by the running of a train of its cars at an unusual and dangerous rate of speed, without proper signals, at a crossing over a public and much traveled street in a city, an instruction that if the deceased was misled by the absence of signals or warning, and led to believe, as a reasonable person, that he could cross the tracks in safety, and while attempting to do so, without fault or negligence on his part, he was struck and killed by the running train, solely on account of the negligence of the servants in charge, his administrator would be entitled to recover, is not error."

And, reading from the opinion, commencing at the bottom of page 225:

"The following is one of the instructions, the giving of which was made a ground for reversing the judgment of the trial court: 'If the jury find from the evidence, that the defendant's servants in charge of the train that killed said Robert J. Blum, gave signals by whistling once, and no more, at such distance, if it exceeded 100 rods from Greenwood street, that said Robert J. Blum would naturally think that he could safely cross before the train arrived at Greenwood street if he heard such whistle, and that he did hear it, and should further find that no bell was rung, and that said train was going at a greater rate of speed than men of ordinary care and prudence in like employment would have run it under like circumstances and conditions, and that said Robert J. Blum, as a reasonable man, was thereby deceived and led to believe that he could cross the tracks of said defendant's railroad in safety, and that if attempting under these circumstances to cross said tracks without fault or negligence on his part, he was, on account of carelessness upon the part of the servants of said defendant in operating said train at an unusual and dangerous rate of speed, struck and killed, then plaintiff would be entitled to recover, if such carelessness was the sole cause of his injuries.'

"The objection urged to the charge is, that it makes the defendant liable for the mistake or miscalculation of the person injured. But that, we think, is not its effect. It does no more than hold

the defendant responsible for the proximate consequences resulting from the position in which the deceased was induced to place himself by its negligent omission to give the required signals of the approaching train where they might be reasonably expected by persons about to use the crossing, and upon the absence of which they might reasonably rely as an assurance that it was safe to cross over; and, from the running of the train without such signals at an unusual and forbidden rate of speed, whereby persons who otherwise might cross in safety would be placed in a position of extraordinary peril. To give the instruction applicable to the case, it was necessary for the jury to find, and they were so told, the existence of the facts thus calculated to mislead the deceased, and further that he exercised the care of a person of ordinary prudence in forming his conclusion that he could safely cross under the circumstances, and that the injury he received was caused wholly by the negligent acts and omissions of the defendant. If the facts stated were established to the satisfaction of the jury, the deceased was not guilty of contributory negligence which precluded a recovery by his administrator."

Here it is claimed by Mr. Johnston that he was in a measure misled or deceived, or given a feeling of confidence or security, by reliance upon some safeguard in the way of a watchman or otherwise at the crossing, and, therefore, what I have read on the subject of reliance by one upon proper care being observed by another as an excuse for not exercising extraordinary vigilance, is inapplicable to this case.

Now, to proceed further with a statement of the facts. According to the evidence, Mr. Johnston was driving west along Central avenue and came to, or at least his horse was upon the easterly track of the Michigan Central Railroad before he became apprised of the approach of the train. He was then warned by several persons of the approach of the train. Exactly what the warning was— what was said and done by way of warning—it is somewhat difficult to determine. One witness, Mr. Gettings, stood about twenty feet easterly from the most eastern track of the Michigan Central on the south side of Central avenue. He says that he called out to Mr. Johnston to look out, that the train was coming, or in substance something like that; and that two other men who stood, it appears, somewhat northwesterly from him—I should think from a

consideration of all their statements perhaps upon the tracks of the
Michigan Central—gave warning to him about the same time, but
the only warning Mr. Gettings heard from them was by way of a
whistle. It appears from the testimony of one of these, Mr. Kessler,
that he also called out something about the approaching train. The
plaintiff admits that he received warning of the approaching train
at about that point, but he says that with the warning came the
injunction or cry to hurry up, and that he was influenced somewhat
by that as well as by his situation.

Now the first question presented is, whether the plaintiff was
negligent in getting himself into that position. It would seem
that by proceeding to that point he had placed himself in a position
that was somewhat perilous, that it was a situation that was likely
to cause him trouble and fright when apprised of the proximity
of a train, and perhaps prevent him from exercising calm judgment
and deliberation as to what he should do. The testimony shows
that there were buildings upon both sides of these tracks both to
the east and to the west, as well as to the north and the south of
Central avenue; that in the direction from which this train was
approaching the view was obstructed by buildings and by a coal-
chute which came up very close to this spur-track (and perhaps by
some cars standing upon the storage track, but about that we are
not very certain) so that a person could not see down these tracks
and observe the approach of trains to the northeast until he came
very close to the track. We gather this from the evidence in the
record. We also find from the record that the jury viewed the
premises, and we deemed ourselves at liberty to do the same,
and we discovered that condition by viewing the premises as
well as from the testimony of the witnesses. In that respect
the crossing is somewhat difficult and dangerous. The testi-
mony of witnesses shows that Mr. Johnston was proceeding
slowly and his vehicle was not making a great deal of noise,
and he says that he was looking and listening for trains. It
is not very plain how much looking and listening he may have
done before he received this warning. The testimony is somewhat
cloudy upon that point. He testifies that he was looking and

listening and could see nothing and heard nothing. That he did look and listen *after* he received the warning, his testimony is quite clear. He says that he knew that the railroad company had a watchman at that crossing daytimes. He was not aware of the fact that the watchman (as the evidence shows) went on at six o'clock in the morning and went off at six o'clock in the evening. He supposed that he was there at this time in the evening and seems to have placed some reliance upon that—the fact that the watchman did not appear upon the tracks to warn him or signal him that there was a train approaching—and he proceeded perhaps with more confidence and perhaps was not so prudent in looking and listening as he would have been had he not supposed there would be a watchman to give him such warning; and we can not say that under the circumstances Mr. Johnston was negligent in thus proceeding, in view of what we deem to have been the duty of the railroad company at that place and at that time and what a traveler upon the highway might rely upon their doing as an act of prudence and care towards the traveling public. Now he approached to that point and then received warning of the oncoming train. The substance of his testimony is that he then took instant thought as to his position and as to where the train might be, and concluded that if it was upon the Michigan Central tracks he could get across those tracks and that that was the best way to proceed— to hurry his horse across—as his horse was already very near the track; and that if the train was upon the Lake Shore track, he would reach this spot of sixty feet between the tracks of the Michigan Central and the tracks of the Lake Shore and pause there—he does not say until the train should pass, but that is apparently what he means, that he would reach that point and stop there as a place of safety; and acting upon this impulse of the moment, this understanding of the probable situation, this instant thought and calculation, he hurried his horse forward, and he says that immediately upon getting across the Michigan Central tracks he stopped his horse. The fact is that that train came along upon the Lake Shore track, a locomotive and a baggage car and perhaps an express car passed by him without touching his horse or coming

in contact with him—the train consisting of some five or six pas-
senger cars besides—and one of the other cars seems to have come
in contact with his horse, and horse, vehicle and rider were all
drawn to the south across the street and thrown upon the ground
with violence, and the vehicle was demolished and the horse was
injured so that it had had to be shot afterwards, and Mr. Johnston
received personal injury. He says that in crossing over the Michi-
gan Central track he stopped in that space of sixty feet between
the tracks of the two railroads, and thinks he stopped about the
center of it. It is clear that he is mistaken about that; his horse
proceeded further toward the west than he supposed or intended.
That he did stop his horse and that he did not attempt to cross
the Lake Shore track ahead of the train is found by the jury,
and we think that finding is sustained by the evidence. Mr. John-
ston testifies that he stopped; Mr. Kessler testifies that he stopped,
and Mr. Gettings testifies that he stopped, and nobody testifies that
he did not stop. The fireman upon the locomotive testifies that just
as the locomotive was crossing over Central avenue he saw this rig
approaching; it was then within twenty or thirty feet of the track
and appeared to be moving towards the track, but it is quite evi-
dent that the point at which Mr. Johnston stopped his horse was
nearer to the track than twenty or thirty feet. Now, as I have said,
the locomotive at that point gave a loud and somewhat prolonged
whistle for the station stop at Wagon Works. This is a circum-
stance in the case. We are not prepared to say that it was neg-
ligence on the part of the railroad company to do it, but it was
one of the concomitant facts and circumstances and it perhaps,
and probably had, some influence on the horse. Mr. Johnston
testifies that after he stopped the horse he thinks it moved forward.
On page 59 of the record he testifies that the horse moved after
he stopped him between the tracks, but this movement does not
seem to have been designed by Mr. Johnston, it was not con-
sciously intended or voluntarily caused, but it was something which
occurred in spite of him in the excitement of the moment, and was
consequent upon the peril of the situation, and we therefore think
it can not be said that he negligently caused it, or that he was

negligent because of a miscalculation as to the point at which he should stop, if the accident was due to such miscalculation, or that he was careless or negligent because of his failure to control the movements of his horse when it got into that small space between the tracks; which lack of control probably caused the calamity. It is apparent that if Mr. Johnston had stopped where he was when warned of the approach of the train, the accident would not have happened. It is apparent that if he had turned back it would not have happened. But, as I say, he acted upon the impulse of the moment, and made a miscalculation and wrong decision in going forward instead of turning back. It seems to us that he can not be held to have been careless in that he did not instantly see the approaching train, and observe that it was upon the Lake Shore track, and thereupon haul up his horse and prevent it from going near to that track. He says he looked, and looked intently and looked carefully, and that he did not see it. I have already given the direction of these tracks and these streets where they cross one another. If Mr. Johnston simply looked to the right and to the left—as he probably did—upon the theory or supposition that these were right-angled crossings, he would not have seen this train. In order to see the approaching train it would have been necessary for him to turn his head somewhat and look back and toward the northeast. The testimony of Mr. Johnston shows that he was not very familiar with this crossing; he had crossed there only occasionally. He lived upon the west side of these railroads and somewhat to the south of where this accident occurred. He was in the habit of going occasionally to West Toledo, which required him to pass to the north of this point, and in crossing over the railroad tracks he usually crossed, as he says, at Monroe street. We find upon consulting the map that at Monroe street the wagon road crosses the railroad at right angles, so that one to observe the approach of a train would naturally turn to look to the right and to the left, and would have the whole view of the tracks; whereas at this point where the accident took place, one would be required, approaching as he was, to see the train approach as this train was approaching, to look somewhat to his rear, a fact of which Mr. Johnston seems to have been unaware.

That it was dusk and that the approach of the train was not readily observable is apparent from the testimony of Mr. Kessler and Mr. Gettings. At the time they gave this warning, they did not see the train approaching, but they heard it. For some reason the approach of the train was not apparent to them and they were not made aware of it except by its noise, and they believe they were not warned of its approach by the sound of any whistle, or otherwise than by the roaring of the train; so that it can not be said that the case is like that of one approaching a track in broad daylight without hindrance to his seeing a train approaching and who will not be heard to say that he did not see it, when, by the opening of his eyes and looking in the ordinary way, it would be evident to him. It seems to us, however, after looking over the situation, that if Mr. Johnston had turned and seen the approaching headlight, unless he had made a swift and accurate calculation as to the angle of these roads, he could not have determined which one of the tracks the train was approaching on and he might have made a miscalculation there just as he did make a miscalculation in driving forward. It must be borne in mind that Mr. Johnston was required—not knowing from which direction the train was coming—to look both to the southwest and to the northeast and to observe six tracks, that is to say, three in each direction. He was upon the tracks of the Michigan Central when he received this warning, and in that situation, of apparent peril, calling for instant action, he hurried forward, and the principle laid down in *Pennsylvania Railroad Company* v. *Snyder,* 55 Ohio St., 342, is, we think, applicable to a situation like this. There it is said that—

"When a person without his fault is placed in a situation of danger, he is not to be held to the exercise of the same care and circumspection that prudent persons would exercise where no danger is present; nor can it be said that, as matter of law, he is guilty of contributory negligence because he fails to make the most judicious choice between hazards presented, or would have escaped injury if he had chosen differently. The question in such case is not what a careful person would do under ordinary circumstances, but what would he be likely to do, or might reasonably be expected to do in the presence of such existing peril, and is one of fact for the jury."

And, in illustration of that principle, in the opinion, a great many cases are cited. We are all familiar with the common case of a passenger, when a collision is iminent jumping from a train and injuring himself, which will not be regarded as a negligent act under such circumstances, although he might have remained upon the train and escaped injury.

The conclusion of a majority of the court is, therefore, upon this record, that the verdict as to the negligence of the railroad company and as to the alleged contributory negligence of the plaintiff below is not against the manifest weight of the evidence, and that unless the answers to the special interrogatories are so contradictory to or irreconcilable with the general verdict that it can not stand, this judgment should be affirmed.

I will spend but a moment upon that. Special interrogatories were submitted by both the railroad company and the plaintiff below. The first interrogatory submitted by the railroad company is:

"As and when the plaintiff, Johnston, came upon or near to the east and west track of the Michigan Central railroad, was he warned and notified of the approaching passenger train in time so that if he had heeded it he could have stopped his horse and avoided coming in contact with it?"

And the jury answered that "No."

Now that answer is hard to reconcile with the facts in the case, though, if it had been answered "Yes," it would not have been conclusive of the rights of the parties here. It seems to us that the answer is clearly wrong under the evidence, unless the jury meant that the plaintiff could not heed the warning and at the same time "hurry up"—considering that as a part of the warning—that is to say, that the warning was that the train was approaching and that it would be necessary for him to hurry up; that he could not do that and also stop in time to avoid the collision. The jury seem to have concluded that he tried to accomplish all three of these things and failed in the last. That they did not mean to say that he could not have stopped in time had he omitted to hurry up is evident from the answers to the third and fourth interrogatories, the third being:

"As and when the plaintiff came up to the main or west track of the Michigan Central Railroad could he then by looking to the north have seen the approaching train in time to have stopped and avoided coming in contact with it?"

And the answer is "Yes."
The fourth interrogatory is this:

"As and when the plaintiff came up to the main or west track of the Michigan Central track and after he had been notified and warned of the approaching train, could he then have stopped his horse and avoided coming in contact with the approaching train?"

And the answer is "Yes."
It is evident that he could have done so, but that does not answer the question submitted to and passed upon by the jury: Whether, in the exercise of reasonable care, he was bound to take such action; or, whether, in omitting to do so, he exercised reasonable care under all the circumstances, considering his situation, the peril etc.? As I have already said, the other answers to the special interrogatories eliminate from the case all charges of negligence except that of the high rate of speed and perhaps that of blowing the whistle immediately at the crossing. The answers to the interrogatories submitted by the plaintiff are all clear and consistent with the general verdict and require no special comment.

The judgment of the court of common pleas will be affirmed.
*King & Tracy* and *Frank H. Geer,* for plaintiff in error.
*E. D. Potter,* for defendant in error.